McALLISTER (POPJNO v.). See Case No. 11,277.

## Case No. 8,658.

McALLISTER et al. v. The SAM KIRKMAN. CARONDOLET MARINE RAILWAY & DOCK CO. v. SAME. FLORENS v. SAME. BALL v. SAME.

[1 Bond, 369.] [1]

District Court, S. D. Ohio. Oct. Term, 1860.

MARITIME LIEN — SUPPLIES — HOME PORT — SEAMEN'S WAGES—TRANSFERS OF VESSELS—KNOWLEDGE—PLACE OF ENROLLMENT.

1. Credit given for supplies furnished a steamboat in her home port, is presumed by the maritime law to have been given to the owner or master, and not to the boat.

2. A claim for wages being a lien on the boat, under all circumstances is an exception to the general rule. Where persons in good faith have given credit to a steamboat for necessary supplies and repairs. as a foreign boat, such persons are not affected by the fraudulent character of sales or transfers by which the boat was placed in the position of a foreign boat.

3. If such persons were apprised of the real nature and character of the transfers, or are fairly chargeable with such knowledge, they must be viewed as participants of the fraud, and can have no claim to any benefit resulting from it.

4. Whatever may be the character of a transfer of an interest in a steamboat, it vests in the purchaser a legal title in that interest, which those dealing with the boat are justified, in the absence of any knowledge to the contrary, in regarding as prima facie valid and unimpeachable.

5. A collector's office, where bills of sale are made matters of record. is the place where alone it may be presumed persons dealing with a boat would search for information in regard to a title.

1 [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

6. The place of enrollment is not conclusive as to the home port of a vessel or boat, and evidence is always admissible to prove the actual residence of the owner, and such evidence furnishes the test of the character of the boat as foreign or domestic.

[Cited in The Rapid Transit, 11 Fed. 330.]

7. The supplies of material-men to a ship belonging or represented to belong to owners residing in another state. are to be deemed to be furnished on the credit of the ship and the owners until the contrary is proved.

8. The clerk of a steamboat has no power to bind the boat for a loan of money without the authority of the master for his acts. .

9. If the clerk procures money on the credit of the boat without the sanction of the master. and the master directly or impliedly assents to it. it will be regarded as the act of the master, and a lien will be created.

10. A pilot on a steamboat who assents to an arrangement by which another person agrees to account to him for his wages, does not by so doing, waive his maritime lien on the boat.

11. A maritime lien is equivalent to an express hypothecation of the boat. and all subsequent transfers or changes of title are subject to this prior and paramount lien; nothing but payment will discharge the boat from its operation.

12. Under the constitution of the United States and the legislation of congress, jurisdiction in the enforcement of maritime liens is vested exclusively in the national judiciary.

13. Credits given to a boat in the progress of construction are not liens by the general maritime law.

14. The purchaser of a boat sold by order of a state court, takes it subject, in his hands. to any lien or interest existing in favor of other parties prior to his purchase.

In admiralty.

Lincoln, Smith & Warnock, for libellants. Dodd & Huston and Taft & Perry, for respondents.

OPINION OF THE COURT. The above named libellants have set up claims against the steamboat Sam Kirkman, in separate libels filed in this court. The claim of McAllister & Co. is for stores and supplies furnished for the use of the boat at St. Louis, between November 9, 1857, and October 7, 1858. amounting to $1,818.84. The claim of the Carondolet Marine Railway and Dock Company is for repairs to the boat, near St. Louis, in the month of September, 1858, amounting to $710.10. The third claim is that of Bernardino Florens, amounting to $1,500. for money advanced or loaned by him at various times between April 22, 1858, and May 12. 1858, for the use of the boat in payment of wages and the purchase of supplies. The libellants aver, respectively, that the supplies furnished, the repairs done, and the money advanced, were necessary in the navigation and business of said boat; that during the time within which these several claims accrued, the Kirkman was owned by John H. Throop, a resident of the state of Kentucky, William H. Cropper, a resident of the state of Ohio. and John D. Montgomery, a resident of the state of Virginia; that the credits were

given to the boat, and not to the owners, and that the supplies, repairs, and money could not have been procured at St. Louis, on the credit of the owners; and that they have an admiralty lien for the same. The libel of Spencer J. Ball asserts a claim for $210.90, for wages due him for services as pilot, rendered in the month of February, 1858. As this claim stands on a different footing from the others, and does not involve the same questions, it will be hereafter separately considered.

In the first three of the foregoing cases the grounds of defense set up are: 1. That the libellants have no maritime liens, which can be asserted and recognized in this court. 2. That the boat, prior to the commencement of the proceedings in this court, had been attached by process from the McCracken county equity and criminal court, being a court of the state of Kentucky, in accordance with the statute of said state, and was not therefore subject to the jurisdiction of this court, as a court of admiralty, at the time of her seizure and arrest. John V. Throop, as master and claimant of the Kirkman, and in behalf of D. A. Givens, as owner, has filed an answer in said cases, averring, in substance, that the boat, during the period within which said claims severally originated, was duly enrolled at the custom-house at St. Louis, and that John H. Throop, a resident of the state of Kentucky, was the owner of an interest of one-third, and Benjamin T. Beasley, a resident of St. Louis, the owner of two-thirds of said boat, and as the managing owner, had the sole control of the boat, at that point; and that during all said period, St. Louis was the home port of the boat; and that therefore the said libellants have no admiralty lien. The answer of Throop also admits the sale or transfer of the interest held by Beasley, first to William H. Cropper, and subsequently to John D. Montgomery, and avers that the same were colorable and fraudulent, and that Beasley continued to be the true and real owner of an interest of two-thirds in said boat, and was so at the times when the claims of the libellants respectively accrued. The answer of Throop further sets up the proceedings in the Kentucky court before referred to, in bar of the jurisdiction of this court. D. A. Givens has also filed an answer, asserting, among other things, that he is the sole and legal owner, by a purchase of the boat at a public sale, under the order of the Kentucky court, prior to her seizure by the process of this court. He adopts, substantially, the answer of Throop, as his defense to the claims of these libellants.

The testimony and exhibits in the case are voluminous, and can not be noticed in detail. The material facts necessary to the consideration of these cases may be summarily stated as follows: The Kirkman was built and equipped at Paducah, in the state of Kentucky, at the cost of about twenty thousand dollars, by the said John H. Throop and Benjamin T. Beasley, during the spring and summer of 1857; and commenced running the latter part of August in that year. Throop was the owner of one-third, and Beasley of two-thirds; Throop residing at Smithland, Kentucky, and Beasley at St. Louis, Missouri. In the progress of the construction and equipment of the boat, the owners incurred debts in Kentucky to the amount of about $10,000, for labor and materials, and loans and advances made, in her construction and equipment. It is admitted that by the statute of Kentucky, on that subject, these creditors had liens on the boat for their respective claims. On December 4, 1857, some three months after the boat had commenced running, a part of the Kentucky creditors applied by petition to the court of McCracken county, under the statute of the state, for an order for the attachment of the boat, and she was seized at Paducah on the same day by the sheriff, under such order. On the 10th of December, by the consent and agreement of the petitioning creditors, the boat was released from the custody of the sheriff, on the bond of J. V. Throop, the master, stipulating for the redelivery of the boat to answer the claims of the creditors at whose suit she was attached. Under the command of Throop, as master, the boat immediately commenced running, making trips to and from St. Louis, on the Tennessee, the Ohio, the Missouri, and Osage rivers, until October, 1858, when, by the order of Throop, the master, and without the consent or knowledge of the owners, she left St. Louis where she had been lying in the night, and was taken to Paducah, and there surrendered to the sheriff of McCracken county. It will not be necessary to refer minutely to all the proceedings in the Kentucky court, as set forth in the long and complicated record, which is in evidence by the respondents. It appears that after the return of the boat to Paducah, probably on October 18, 1858, she was again attached at the suit of certain Kentucky creditors; and being in the custody of the sheriff, on his affidavit that no one had offered to bond the boat, that great expense was incurred in keeping her, and that she was liable to deterioration in being kept in custody, an order was made for the sale of the boat; and on the 6th of November following, pursuant to such order, she was offered at public sale, and sold to the said D. A. Givens for $5,500, he giving his notes for the purchase money, payable on time. These notes are not yet paid; it appearing that Givens has declined payment until a decision shall be had in the libels filed in this court. The boat was enrolled at Paducah, immediately after the sale to Givens, and was run by him as owner until February 10, 1859, when, being at the port of Cincinnati, she was seized by the marshal on process from this court.

The first question to be considered is: Have these libellants a paramount admiralty lien for the claims asserted by them in this court? If St. Louis, the place where these claims origi-

nated, was the home port of the steamboat during the time the credits were given, it is clear there is no such lien. In that case the maritime law goes on the presumption that the credit was to the owner or master, and not to the boat. A claim for wages being a lien on the boat under all circumstances, is an exception to the general rule.

As before stated, the libellants aver that their claims for supplies, repairs, and money loaned, are liens, for the reason that the credits were to a boat. which, as to them was a foreign boat, and were necessary to her successful navigation. It is also averred that these credits could not have been procured, except on the supposition that there was a lien on the boat. And the evidence is entirely conclusive, that the credits were all given on this supposition and belief, and that neither Cropper nor Montgomery could have obtained credit at St. Louis for any considerable amount on their personal responsibility. The witnesses who prove these several claims, state explicitly that Cropper and Montgomery were without credit at St. Louis, and that the necessities of the boat could not have been supplied on their personal pledge or undertaking. This is substantially admitted by the respondents. and it is therefore unnecessary to refer specially to the evidence on the point. But it is insisted by the respondents, that Cropper and Montgomery were not the owners, in fact or in law, during the time these claims originated, and that for the purposes of the present case, Beasley was owner of a two-thirds interest, and being a citizen and resident of St. Louis, that place must be held to be the home port of the boat. That the transfer or sale by Beasley to Cropper, and afterwards to Montgomery, was merely colorable and fictitious, as between the parties, there is no reason to doubt. The design of Beasley clearly was to place the ownership of the boat in persons not residents of Missouri. that credit might be obtained at St. Louis for the Kirkman as a boat foreign to that port. Beasley was laboring under pecuniary embarrassment, and could not have procured credit on his personal responsibility, to meet the wants of the boat. in the prosecution of her business. He therefore transferred his interest to Cropper. a resident of Ohio, and wholly without pecuniary means. for the sum of $14,000, for which his notes were given, payable on time. Beasley executed to him a bill of sale, in due form, which was recorded in the office of the collector, at the port of St. Louis, and an en rollment of the boat there made, on the oaru of Cropper. that he was the owner of two-thirds of the boat, and that Throop was the owner of the other third. In February, 1858, at the request of Cropper. and without the payment of any part of the purchase money, this sale was virtually annulled, and John D. Montgomery, also a young man without property, whose residence was in the state of Virginia, was substituted in the place of

Cropper, and gave his notes for the purchase money. and Cropper's notes were given up. It appears that Beasley, after parting with his interest in the boat, continued to represent the interests of the boat, and transact business for her at St. Louis. After the transfer to Montgomery, he acted as her agent, under a power of attorney from him.

In the view taken of the question before the court, it seems wholly unnecessary to remark further upon the sale by Beasley. Its real character is too patent to justify discussion. As between Beasley and his creditors, no court would hesitate to pronounce it fraudulent and void. But what shall be its effect on the rights of these libellants, now asserting a lien on the boat as foreign to the port of St. Louis, is a wholly different question. And it would seem not to admit of doubt, that if the libellants in good faith, and acting on the belief that the boat was owned by persons not residents of the state of Missouri, gave her credit for necessary supplies, repairs, etc., as a foreign boat, and with a view to a maritime lien for their security. they are not affected by the fraudulent character of the sales or transfers by which the boat was placed in that position. On the other hand, it is equally clear, that if the evidence fairly warrants. the conclusion, that they were apprised of the real nature and character of the transfer of Beasley's interest in the boat, or are fairly chargeable with such knowledge, they must be viewed as participants of the fraud, and can have no claim to any benefit resulting from it. And this presents the only question, involving doubt or difficulty, as to this branch of these cases. This question I have carefully considered, and am obliged to say, as the result of my deliberation, that I see no sufficient ground for finding, that the libellants are implicated in the fraudulent conduct of Beasley. There are facts in the case, which, perhaps, warrant a suspicion that McAllister and the marine railway and dry dock company were cognizant of the real character of the sales by Beasley to Cropper and Montgomery. It is in evidence that there had been long-continued and somewhat intimate business relations between McAllister and Beasley. The firm of McAllister & Co. consisted of one person—McAllister—and was extensively engaged at St. Louis, in the business of supplying stores and necessaries for steamboats; and Beasley, as a steamboat owner and agent. had dealt largely with the firm, and was frequently at its place of business. But there is no tangible or reliable fact in evidence showing that McAllister was advised of the character of the transfer by Beasley, by which his interest was legally vested in Cropper and Montgomery. The same remark applies to the claim of the marine railway and dry dock company. McAllister was a principal stockholder in the company. and one of the active managers of its concerns.

It is in evidence, too, that Beasley used his influence in having the boat taken to the dock of this company, for the purpose of repairs. But this, surely, does not make McAllister a partaker in Beasley's fraud. And there are some facts in the case which repel any unfavorable presumptions in regard to the claims just referred to. In the first place, it may be remarked that there is no controversy about the fairness and justice of the accounts of McAllister and the railway and dry dock company. The stores and supplies charged in the account of the former were furnished to the boat, at fair prices; and these stores and supplies have not been paid for; and there is no pretense that the dry dock company did not make the repairs charged, or that the price charged is not reasonable. But this is not all. As before remarked, the proof is conclusive, that these supplies and repairs were necessary for the boat, and that as to both claims, credit was given to the boat, and not to the owners. It is not readily perceived why these credits could be regarded as imparting a maritime lien on the boat, on any other supposition than that the creditors supposed she was legally foreign in the port of St. Louis. Again: it is very clear that whatever may have been the character of Beasley's transfer of his interest, it vested in the purchaser a legal title in that interest, which those dealing with the boat were justified in the absence of any knowledge to the contrary, in regarding as prima facie valid and unimpeachable. The bills of sale were matters of record in the collector's office, where alone it may be presumed persons dealing with the boat would search for information in regard to title. The bill of sale from Beasley to Cropper is in the usual form, and bears date October 7, 1857. It sets out the residence of Cropper as being at Portsmouth, in the state of Ohio. It appears from Beasley's deposition, that the boat was enrolled at St. Louis by Cropper; and from an authenticated copy of his oath then made at the custom-house at St. Louis, it appears that he swore he was the owner of two-thirds of the boat, and that Throop was the owner of the other third. In this affidavit he also says that he is a resident of Portsmouth.

The facts in relation to the enrollment of the boat do not clearly appear from the evidence before the court. It is probable she was originally enrolled at Paducah, where she was built, but her enrollment there is only made out by inference and not by authoritative testimony. Nor is there any record evidence of an enrollment by Cropper at St. Louis after his purchase from Beasley. But, as before remarked, Beasley swears that she was enrolled there by Cropper, and that is probably the fact. I do not see that the place of her enrollment can have any bearing on the question which was the home port of the boat. The statute requires the enrollment to be at the port "at or near which the husband or acting or managing owner or owners of such ship or vessel, usually reside or resides." 1 Stat. 56, § 4.

But it has been often held, by our courts of admiralty, that the place of enrollment is not conclusive as to the home port of a vessel or boat, and that evidence is always admissible to prove the actual residence of the owners; and that such evidence furnishes the test of the character of the boat as foreign or domestic. In the case of The Nestor [Case No. 10,126], Judge Story says: "Prima facie, the supplies of material to a foreign ship, that is, to a ship belonging or represented to belong, to owners residing in another state or country, are to be deemed to be furnished on the credit of the ship and the owners, until the contrary is proved." And in the very able opinion of Judge Wells, of the United States court for the district of Missouri, Hill v. The Golden Gate [Id. 6,492], it is said: "It is apparent, therefore, that the place of enrollment has nothing to do with the credit that is given, and, therefore, has nothing to do with the question of lien." Such, I may add, has been uniformly the decisions of this court, as to the effect of an enrollment. It is deemed unnecessary to refer to the numerous cases in which this doctrine has been held.

From the views thus indicated, it results: 1. That the supplies furnished by McAllister & Co., and the repairs made by the Carondolet Marine Railway and Dry Dock Company, as charged in their respective accounts, must be deemed on the evidence as necessary to the successful prosecution of the business of the boat. 2. That the boat, during the time these claims originated, must be held to be foreign at the port of St. Louis. 3. That the credits given by said libellants were given to the boat and not to the owners. 4. That although the conduct of Beasley and others connected with the boat, may have been reprehensible or fraudulent, these libellants in the absence of proof that they were cognizant of and participants in such conduct, are not affected by it.

But the claim of Florens, for money advanced for the use of the boat, is presented in a different aspect from those just referred to. In the first place, there are sufficient reasons for the inference that there was collusion between Beasley and Florens for a dishonest purpose. It is clearly proved that Beasley at different times withdrew from the earnings of the boat some $4,000, which was not applied to the payment of her current expenses. Capt. Throop says, in his deposition, that Beasley once proposed that they should draw money from the boat, place it in the hands of some confidential friend, and receive it from him in the form of a loan to the boat, on her credit, and thus create a maritime lien on which proceedings could be instituted, and the boat forced to sale. Throop did not assent to this plan, regarding it as dishonest; but the evidence, I think, shows that Beasley to some extent acted

upon it. It appears, as I understand the proof, that in one instance there is a charge on the boat books of $405, for money received by him from the boat, and on the same day a due bill was given to Florens precisely for the same sum, as for money loaned by him. This is one of the items in the account of Florens. And the same coincidence occurred in relation to an item of $250, also charged in his account. These facts, in connection with the evidence by Throop above referred to, and the further fact that it was upon the advice and suggestion of Beasley that the application for a loan from Florens was made, tend directly to implicate Florens as a participant in the intended fraud of Beasley.

But there is another stringent reason for the rejection of Florens' claim. The loans made by him to the boat were not authorized by or known to the master of the boat. Capt. Throop states not only that he did not authorize these loans, but that he had no knowledge of them until after the institution of the suits in this court. They were made, therefore, by the clerk of the boat, probably at the suggestion of Beasley, but wholly without the sanction of the master. Now, although it is true in reference to steamboats on the western waters, that the clerk is in some sense the financial agent of the boat on which he serves, his acts as such must be under the authority of the master, and he has no power to bind the boat for a loan of money without such authority. It is true, if the clerk procures money on the credit of the boat without the sanction of the master, and the master directly or impliedly assents to it, it will be regarded as the act of the master, and a lien will be created. But where, as in this case, the loan was not known to the master until long after it was made, there can be no presumption that he authorized it or gave his assent to it. On this ground, therefore, I think the claim of Florens must be rejected.

As to the claim of Spencer J. Ball, for wages as pilot, it is admitted by the counsel for the respondents, that it is a valid lien on the boat, irrespective of the question whether St. Louis was her home port. But, it is contended, that he has waived or released his lien by his assent to an arrangement by which Beasley agreed to account to him for the sum due. This applied to a part only of the sum claimed by him. There is no evidence, however, that Beasley has paid or accounted for any part of this claim. Ball is still the creditor of the boat, on her books, for the whole amount of wages claimed by him. It is clear, therefore, that there is no legal waiver or release of his lien on the boat, and that he is entitled to a decree if this court has jurisdiction in this case. The cases are numerous, in the books, in which it has been held that the taking of a promissory note is not a waiver of a maritime lien. It was so ruled by Judge Story, in the case of The Chusan

[Case No. 2,717]. And the same doctrine is distinctly affirmed by Judge McLean, in the case of Raymond v. The Ellen Stewart [Id. 11,594]. But it is quite needless to multiply references on this point. The law is too clearly settled to admit of doubt or controversy.

I will now briefly consider the question of jurisdiction, which is presented in this case. It is insisted, by the counsel for the respondents, that the attachment and sale of this boat by the order and authority of the Kentucky court, prior to her seizure under the process of this court, is a bar to any proceeding in admiralty founded on a claim originating before the sale under the state authority. If this position is well taken, this court has no jurisdiction, and these libels must be dismissed. The principle involved in the question has been so frequently considered and passed upon by judges and courts of the highest standing in this country, that it is quite unnecessary that I should discuss it at any length.

The facts necessary to notice, as applicable to the question, have been before sufficiently stated. From these, it appears the boat was attached in Kentucky at the suit of creditors at Paducah, by order of the court of McCracken county, in that state, on December 4, 1857, and held in the custody of the sheriff until the 10th, when, by the consent of the petitioning creditors, on a bond for her delivery to answer their claims, the sheriff gave possession to the master. She was afterward attached at Paducah, by the order of the same court, at the suit of other creditors, and again released from the custody of the sheriff, by giving bond as above stated. In charge of the same master, the boat continued to navigate the western rivers, carrying freight and passengers, making St. Louis her principal stopping place for business purposes, until the beginning of October, 1858, when she was taken to Paducah by the master, and placed in the possession of the sheriff of McCracken county. A few days after, she was, by the order of the Kentucky court, sold at public sale, and the claimant, D. A. Givens, became the purchaser. The claims now prosecuted in this court, as before noticed, originated at St. Louis, between the beginning of November, 1857, and the 18th of October of the next year.

If the court is right in holding that these libellants, with the exception of Florens, have a valid maritime lien on the boat, it is clear that no state legislation can supersede or annul it. By the well-settled principles of the maritime law, such a lien is equivalent to an express hypothecation of the boat, and all subsequent transfers or changes of title are subject to this prior and paramount lien. Nothing but payment will discharge the boat from its operation. And it is equally clear, that under the constitution of the United States and the legislation of congress, the jurisdiction in the enforcement of maritime

liens is vested exclusively in the national judiciary. In the case of The Chusan [supra], Judge Story held, that "the subject of admiralty and maritime jurisdiction is withdrawn from state legislation, and belongs exclusively to the national government and its functionaries." In the same case, the learned judge says: "The constitution of the United States has declared that the judicial power of the national government shall extend to all cases of admiralty and maritime jurisdiction, and it is not competent for the states to enlarge, or limit or narrow it. In the exercise of this admiralty and maritime jurisdiction, the courts of the United States are exclusively governed by the legislation of congress, and in the absence thereof by the general principles of maritime law."

And the supreme court of the United States, in the case of New Jersey Steam Nav. Co. v. Merchants' Bank, say: "The exclusive jurisdiction in admiralty cases was conferred on the national government as closely connected with the grant of commercial power." 6 How. [47 U. S.] 392. But this doctrine has been so often affirmed not only by the supreme court, but by many other courts of the United States, and also by state courts of high position, that it does not require the citation of authorities to sustain it. It is now referred to as sanctioning the conclusion, that the statute of Kentucky can not have the effect of depriving these libellants of the full benefit of their maritime liens. These existed in full force before the purchase of the boat by Givens, and any right he acquired under that purchase was subordinate to them. The court in Kentucky had no power to adjudicate upon the rights of these libellants for the reason that it had no jurisdiction to enforce their liens; and if such power did exist, these libellants were not parties actually or constructively to the proceedings in that court, and their rights could not therefore be affected by its action. It will be apparent, then, that this is not a case of conflict of jurisdiction between the Kentucky court and this court, as courts of concurrent jurisdiction. The purchaser of the boat in the sale made under the order of the court in Kentucky did not acquire, and could not acquire the rights of these libellants in virtue of their paramount liens. This principle is recognized and asserted by Judge McLean in the case of The John Richards [Case No. 7,361] in the circuit court of the United States for the district of Michigan. It was also affirmed by the same learned judge in this circuit, on an appeal from this court, in the case of The N. W. Thomas [Id. 10,386]. See, also, Ashbrook v. The Golden Gate [Id. 574].

The application of this principle to the cases before the court is in no way affected by the fact that the claims of the Kentucky creditors are for money, labor, materials, etc., in the construction of the boat; and, therefore, that their liens, under the state law, are prior to those of the libellants for stores, supplies, and repairs after the boat was completed, and while engaged in navigation. It is well settled, that credits to a boat in the progress of construction are not liens by the general maritime law [People's Ferry Co. v. Beers] 20 How. [61 U. S.] 393; and if they were so, a state court would have no power to enforce them. This boat, after her seizure by the Kentucky creditors, was permitted to engage in carrying on commerce between the ports of different states; and thus engaged, she was undoubtedly subject to the operation of the well-known principles of the national maritime law. For the purposes of successful navigation, she needed credit in a port distant from the place of her construction, and such credit was given to the boat by persons who could not be presumed to know of any prior local liens, and whose rights could not therefore be affected by such liens. It is obvious that any other doctrine would seriously cripple the commerce and navigation of the western waters, and would virtually set aside the maritime law of the land as applicable to those waters.

The case of Taylor v. Carryl, 20 How. [61 U. S.] 583, has been brought to the notice of the court, and it is insisted by the respondents' counsel that it is decisive against the jurisdiction of this court in the cases now under consideration. I do not so understand the opinion of the supreme court in that case. They decided that the district court of the United States for the Eastern district of Pennsylvania never had the legal possession of the vessel which had been sold under its decree; and, therefore, that the purchaser under that decree acquired no title. As in a court of admiralty the possession of the res is the basis on which alone any subsequent proceeding has its warrant, it resulted necessarily in that case that there was a want of jurisdiction, and that the decree of the court was therefore a nullity. The supreme court say, in the conclusion of their opinion: "The view we have taken of this cause renders it unnecessary for us to consider any question relative to the respective liens of the attaching creditors and of the seamen for wages, or as to the effect of the sale of the property as chargeable or as perishable upon them." The court nowhere asserts in the opinion, that the jurisdiction in admiralty by the constitution of the United States is not exclusive in the courts of the United States, or that the legislation of congress has limited that jurisdiction, except in so far as the reservation of the rights of parties to proceed at common law, may be regarded as a limitation. Nor do they reverse the principle often announced by the decisions of that court, that it is not in the competency of state authority to abrogate or supersede a maritime lien created by the national maritime law. The court undoubtedly affirm the well-established rule of law, that as to courts of concurrent jurisdiction, the court first ac-

quiring jurisdiction will retain it free from any interference from any other court. And they also hold, that in admiralty as well as in cases at law, property in the actual custody of an officer under valid process, either from a state or federal court, is not subject to seizure or levy by process emanating from another jurisdiction. It is true, the learned Chief Justice Taney, in his very able dissenting opinion in the case, controverted this principle as applicable to cases where there was a prior admiralty lien. The majority of the court, from a laudable desire to avoid collisions with the state authorities, held that prior legal possession in a state officer withdrew the property from the jurisdiction of the admiralty court. It is not for me to make comments on the opinion of the majority of the court on this point; but it will imply no disrespect to the decision of that high tribunal to remark, what is undoubtedly true, that this doctrine of rigid non-intervention with state jurisdiction was not previously "supposed to apply in cases where its effect would be to deprive a party of a vested right under a clear admiralty lien."

But in my judgment, the decision of the supreme court in Taylor v. Carryl [supra], can not be viewed as having any application to the cases now under consideration. In that case, the vessel was in the actual custody and possession of the state officer under process from a state court when seized in admiralty under process from the district court of the United States. The supreme court held, that the latter process did not give jurisdiction to the district court, and that its subsequent proceedings, including the sale under its decree, was invalid. But in the case before this court, it is to be observed that the steamboat Kirkman, when seized at Cincinnati under the process of this court, was not in the custody of the law or of any officer of the state of Kentucky, but under the control and in the actual possession of Givens, the claimant in these cases, as the purchaser of the boat under the order of the Kentucky court. The boat was then employed in the navigation of the western rivers for the benefit and under the control of Givens. The court in Kentucky had in fact expressed its jurisdiction, so far as the boat was concerned, by its order for the sale of the boat, and her actual sale to Givens. So far as he acquired any interest in the boat under the sale, it was his private property, but was undoubtedly subject in his hands to any lien or interest existing in favor of other parties prior to his purchase. This case does not, therefore, involve any conflict of jurisdiction between the Kentucky court and this court, or any collision between the officers of the two courts. And, therefore, the reasoning of the supreme court of the United States in favor of the expediency of avoiding all occasion of jealousy or hostility between the state and federal authorities does not apply. I concur fully in the soundness of the policy so forcibly and ably vindicated by the supreme court in the case referred to; and have studiously aimed in the performance of my judicial duties to enforce its practical observance. But I am clear that in the cases before the court its application is not called for.

A decree may be entered in favor of the libellants, McAllister & Co., the Carondolet Marine Railway and Dry Dock Company, and Spencer J. Ball, for their respective claims. The libel in the name of Bernardino Florens is dismissed at his costs.