## Case No. 4,364.

### The ELIZA LADD.

[3 Sawy. 519; 1 N. Y. Wkly. Dig. 517; 8 Chi. Leg. News, 98; 21 Int. Rev. Rec. 48; 2 Cent. Law J. 822; 1 Law & Eq. Rep. 28; 7 Leg. Gaz. 414.] [1]

District Court, D. Oregon. Nov. 24, 1875.

John W. Whalley, for libellant.
E. C. Bronaugh, for claimant.

DEADY, District Judge. The amended libel in this case was filed October 18, 1875, and alleges substantially that the Eliza Ladd is a domestic vessel, propelled by steam, of the burden of 118.47 tons, and was enrolled at Portland on August 31, 1875, and is employed in navigating the waters of the Willamette; that she was launched at Portland near Smith's mill, in October, 1874, and on May 28, 1875, she made a voyage in tow of another vessel to the foot of Stark street, and there took on her boilers, engines and machinery, the same having been in the ferryboat Portland No. 1, and from thence, on June 1, 1875, made a voyage in like manner to the libellant's works at Albina on said Willamette river; that on June 1, 1875, the libellant, the Oregon Iron Works, a corporation duly formed under the laws of Oregon, and engaged in business at Albina, was employed by the owner and claimant of said vessel, Joseph Knott, to furnish the material in addition to the boilers, engines and machinery aforesaid, and perform the labor necessary to fit, equip and furnish said vessel for such sum as the same should be reasonably worth; that between said last-mentioned date and August 18, 1875, said libellant performed said contract, and that the reasonable value of the materials and labor furnished by libellant in so doing is $1,498, in lawful money of the United States, and that no part of said sum, except $13.84, in old iron, has been paid libellant.

The claimant excepts to the libel, that the contract described therein is not a maritime one, and that this court has no jurisdiction to enforce the supposed lien incident thereto.

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission. 1 N. Y. Wkly. Dig. 517, contains only a partial report.]

It is admitted that according to the ruling of the supreme court in People's Ferryboat v. Beers, 20 How. [61 U. S.] 393, and Roach v. Chapman, 22 How. [63 U. S.] 129, a contract to build or construct a ship, is not a maritime one, and therefore not within the admiralty jurisdiction of the United States. This rule is founded upon the assumption that such a contract is one "made on land to be performed on land." On the other hand it is admitted that, by the general maritime law of the civilized world, a contract to build a ship is a maritime contract, because it has relation to a ship as the agent or vehicle of commerce upon a navigable water. Ben. Adm. §§ 213, 264.

Under the law of the cases above cited, it is not always easy to determine what is a maritime contract. In the case in 20 How. [61 U. S.] the contract was for "work done and materials employed in constructing the hull of a new steam ferryboat," while the case in 22 How. [63 U. S.] was for furnishing "boilers and engines" to be placed in a steamboat at the time and place of the construction of the hull. It is well established that a contract to furnish work and materials to be employed in making repairs on a vessel is a maritime contract. The St. Lawrence, 1 Black. [66 U. S.] 522; Peyroux v. Howard, 7 Pet. [32 U. S.] 324. And in such cases, even if the vessel is a domestic one, if the local law gives the material-man a lien, it may be enforced in the admiralty. The General Smith, 4 Wheat. [17 U. S.] 438; The Lottawana, 21 Wall. [88 U. S.] 579. Now, repairs include all alterations and additions made to a vessel, short of destroying her identity. "A ship is always the same ship, although the original materials of which it was composed may, by successive repairs and alterations, have been in the course of time entirely changed." Ben. Adm. § 223.

Suppose the Eliza Ladd to have been built and used as a barge, and that afterwards her owner had concluded to use her as a steam ferry or tug boat, and for this purpose should make a contract with A. B. to put the necessary boilers and machinery into her, such an agreement would doubtless be a maritime contract. And yet a contract to build a steam ferry or tug boat outright would not be, under the decisions cited, a maritime contract. My own impression is that any contract made to equip, fit or furnish a vessel after she is launched and afloat, is a maritime contract. It is not in the language of 20 How. [61 U. S.] supra, "a contract made on land to be performed on land," but one made with reference to a ship already in existence and floating upon the element for which she was originally designed. Such a contract is to be performed on water as much as an ordinary contract of affreightment or repairs. When the contract to build includes the fitting, furnishing, and equipping also, it may be said, that as it is an entirety and not divisible, and the

principal feature of it—the building and launching the hull—being non-maritime, it gives character to the whole of it.

When the contract set up in the libel was made, the Eliza Ladd had been launched eight months, and for aught that appears was in the same condition she is now, as to her capacity for changing place or carrying freight and passengers, less the machinery necessary to propel her by steam. She was then, it appears to me, a ship, within the definition in Ben. Adm. § 215: "A locomotive machine adapted to transportation over rivers, seas, and oceans." She was certainly a machine—an artificial contrivance, and one capable of locomotion or change of place, as is shown by the two short voyages she made before the performance of this contract; nor does it make any difference whether she was "propelled by the wind, the tide or paddles, by steam, by animals, or by the human arm, or towed by another vessel" (Id. § 217), so that she floated in and moved through the water. Being of one hundred and eighteen tons burden, she was also adapted to the transportation of freight and passengers so far as she had capacity for locomotion. Separate pieces of timber or iron, or both, being put together in a certain form, so as to float upon the water and transport or bear up freight or passengers, may become a ship. At what point of time is this change accomplished? I am inclined to think that the correct answer to this question is suggested in the brief for the libellant, and that it is "at the moment when she leaves the ways, and her keel strikes the element for which she was originally designed." That is the moment of her birth as a ship, and the occasion when a name is usually bestowed on her. Thereafter all contracts to equip, furnish or repair this machine have direct reference to a vessel in esse, with capacity for locomotion and transportation on navigable waters, and are, therefore, maritime.

Although a contract to build a ship is in fact a maritime one, yet under the rule laid down in 20 and 22 How. [61 and 63 U. S.] supra, it is to be otherwise regarded in this court. The difficulty is to determine what is included in building a ship—the contract for which, says the court, is not maritime, because it is "made on land to be performed on land." But, even under that rule, it seems safe to say, that a contract made after a vessel is launched and afloat, to furnish her with a particular means of propulsion, as sails or steam paddles, or to change the mode of her propulsion, is a maritime contract. Certainly it is not a contract to be performed on land; neither is it a contract to build any more than any contract for repairs.

Although this is a domestic vessel, and this work and materials were furnished in her home port, yet the libellant has a lien for the amount of his claim under section 17, p. 656, of the Oregon Code, and the contract being a maritime one, the lien may be enforced in admiralty.

The exception is overruled.