## The Rapid Transit.

*(District Court, W. D. Tennessee.    March 18, 1882.)*

1. MARITIME LIEN—HOME PORT—REPAIRS—COMPLETION AT FOREIGN PORT.

   Where a contract for the reconstruction of a vessel was made by the owner at the home port, but owing to low water the vessel was carried to a foreign port, where the work was completed by the contractors, no lien for that portion done in the latter place arises either under the general maritime or local law of the latter place.

2. LIEN UNDER LOCAL LAW—KENTUCKY STATUTES—EFFECT OF REPEAL.

   The Revised Statutes of Kentucky, chapter 7, (1 Stanton, 201,) gave a lien for repairs done on domestic vessels in that state, but this chapter was repealed by article 1, section 2, of the General Statutes of 1873, and there was from that time until the act of May 5, 1880, no lien for such repairs.

3. VESSEL—PART OWNERS—SUPPLY LIEN—EFFECT OF DOMICILE—REGISTRATION.

   Where a vessel is owned by two, one residing in Kentucky and the other in Ohio, there is no lien under the general maritime law for necessaries in either state, although the vessel is enrolled in Ohio and the repairs were done or supplies furnished in Kentucky.

4. PART OWNER—LIENS UNDER LOCAL LAW—PRIORITY OF MARITIME LIENS.

   Where a part owner paid the claims of those furnishing necessaries for a vessel, or advanced the money to buy them, in the port of his residence, he cannot, as against other creditors furnishing the vessel at a foreign port, claim directly or by assignment any lien under the local law ; because, while the local liens are ranked with the maritime liens, they cannot by force of the statute acquire exemption from the rules that govern maritime liens in their relation to each other.

5  LIENS GIVEN BY STATUTE—RULE OF DISTRIBUTION AMONG CLAIMANTS—PRINCIPLES OF MARITIME LAW TO GOVERN.

   A court of admiralty will sometimes, on the particular facts of a case, disregard the rule of equality of distribution among claimants of the same class, and

pay the last furnisher before the first. It will do this as against local liens in the same manner and on the same principle applicable to ordinary maritime liens, although the statute itself makes no distinction, and although the general rule of equality between local and maritime liens for supplies is fully recognized. The statute will be construed according to the peculiar principles of the maritime law.

In Admiralty.

The Rapid Transit was arrested on the libel of mariners for wages and sold in this court. Certain creditors, who had furnished the vessel at Memphis, Tennessee, intervened for their claims, as did other creditors who had furnished the vessel at Covington, Kentucky, and Cincinnati, Ohio. Prior to September 9, 1879, she was owned by Collins, who resided at Covington, but did business at Cincinnati, and Holterhoff, who resided in Cincinnati. Collins was a man of wealth and Holterhoff a man of credit and means. On that day she was sold to the Rapid Transit Boating Company, a corporation organized at Covington, Kentucky. This company was a scheme of the owners of the boat and W. J. Ashford, by which the boat was to be transferred to the company, in payment of stock subscribed by the owners, at $10,000, and $3,500 additional stock was to be placed by Ashford, who was to be master, among the planters along the river below Memphis, in which trade she was to be run as a cotton boat. She was enrolled at Cincinnati. Preparatory to this new trade the vessel was to be reconstructed by elevating her cabin, which was done, at a cost of some $2,000, at the docks of Collins and his partner at Covington. The corporation organized, and Collins and Holterhoff paid their stock with the boat, but no other stock was ever paid in, though subscribed by Ashford. Outside parties holding a share or two of stock were elected among the five directors, Collins being secretary and Ashford superintendent. While the boat was undergoing the repairs, the water being low, it was thought prudent to remove her to Cairo, Illinois, where the contractors finished the work. It was done under the supervision of Collins and Ashford, the former making the contracts. The claims are for this work by some of the original parties, and by Collins, who paid others upon drafts of Ashford and otherwise. There are also claims filed for supplies furnished prior to the transfer, some by original holders and some by Collins, who paid them. Ashford testifies that the cost of this reconstruction was agreed to be paid by Collins and Holterhoff, while Collins testifies it was to be paid by the corporation, and that he advanced the money, "considering the advance as in the nature of advances upon a bottomry bond." The vessel was regularly trans-

ferred to and registered at Cincinnati, in the name of the corporation, the work all being done after the transfer. Ashford brought the vessel to Memphis and put her in the trade to the "bends" below, and in a few months she was libelled and sold in this case for $1,500, which is the fund in controversy between the Memphis creditors, Collins, and other Cincinnati and Covington creditors. One creditor, on the order of Collins, sent wheels from Buffalo, New York, to Cairo. The Memphis claims are for necessaries used in running the boat just before the seizure.

*H. C. Warinner* and *R. D. Jordan*, for libellants.

*H. F. Dix*, for intervening libellants.

HAMMOND, D. J. A disputed question of fact lies at the threshold of this case. If Ashford's testimony be true, Collins has no claim whatever of any kind. The testimony was read at the bar, and I have since carefully read it twice without any very satisfactory conviction either way. And I am quite as much at a loss to say where the burden of proof lies,—whether on Collins, to prove that the sale to the corporation was of the vessel as she stood; or on the other intervening libellants, contesting his claim, that it was as she would be after the changes in her construction. The case should not have been left to stand on the conflict between the two witnesses Collins and Ashford. The other part owner, Holterhoff, no doubt knows all about it, and perhaps other persons who appear in the record, and they should have been examined. The fact that they were not is against Collins, whose testimony does not impress me favorably. I am inclined to think, however, that the burden is on the Memphis creditors to show that Collins and Holterhoff were to pay for the reconstruction, and on the record as it stands they have not answered that burden. But, notwithstanding the disagreeable impression of Collins' deposition, there is some corroboration in the documentary proof, although it may be that he has overreached Ashford, as suggested by counsel, in the matter of writing up the documents; and I must hold, without taking space to analyze the proof, that the corporation is liable for the reconstruction.

It was a Kentucky corporation to which the vessel was sold, and the remodeling being done in that state there is no lien under the general maritime law. I do not think the fact that while the work was going on the boat, on account of low water, was dropped down to Cairo, in another state, where it was completed, affects that result. We cannot separate that done in Kentucky from that done in Illinois, it being an entire contract. Besides, the boat, as she lay at Cairo,

was not while on a voyage found in a foreign port in necessitous circumstances, in the sense of the maritime law, but was carried there by consent of all parties for convenience of completing what was begun, and could have very well been finished in Kentucky. It was said in *Conrad* v. *Atlantic Ins. Co.* 1 Pet. 386, 436, that it is no objection to a *respondentia* loan that the money was paid after the departure of the ship on the voyage. The same principle applies to bottomry bonds. *The Draco,* 2 Sumn. 157, 180; *The Mary,* 1 Paine, 671. In the incipiency of a contract for repairs or supplies I doubt not the location of the vessel is a necessary element in determining the question of lien, but I find no trace of any principle that requires the furnishing to be completed in that place as affecting it; and it would be adding to the perplexities, not to say absurdities, of our maritime law, created by the peculiar relation of our contiguous states to each other and the subject-matter, to hold, where a contract for repairs or supplies to be furnished at one place cannot be entirely executed at that place and is finished at another, that the existence or non-existence of a lien must be determined with reference to the particular articles furnished in the one place or the other. Desty, Adm. §§ 68–91; 2 Pars. Ship. 322–337.

In the case of *The Isaac Davis,* narrated by Judge Hopkinson in *Sarchet* v. *The Davis,* Crabbe, 185, 199, it appears that a vessel built and owned in Delaware was carried in an incomplete condition to Philadelphia to be rigged, and Chief Justice Taney doubted whether the workmen and material-men at Philadelphia had a lien under any circumstances, because, among other things, "coming here in this condition and for this purpose, she could not in any sense be said to be in her passage from Fredrica to Philadelphia to have sailed on a voyage from one port to the other." He *decided* that the owner, being of credit and having made the contract for the rigging, there was no lien, whether it be treated as repairs or original construction, though he thought it was probably not repairs. See *The Iosco,* 1 Brown, Adm. 495, and *The Eliza Ladd,* 3 Sawy. 519. So, on the facts of this case, in any view there was no lien for the work done at Cairo under the general maritime law. The Kentucky corporation, through Collins, had made the contract for the work, and there is no satisfactory proof that it was done on the credit of the vessel, but rather on the credit of the corporation or Collins himself, a wealthy man, the former owner and the chief man in the corporation. Whether there could be any lien claimed under Illinois statutes I am not advised; nor does it seem important, in the view I take, to inquire as to these

statutes, for I hold that the work done at Cairo (except, perhaps, the painting) was a continuation of the work commenced in Kentucky, and is to be treated as if done there and not in Illinois; and, for the reasons I have already stated, as the general maritime law would not operate to give a lien, I do not see why a court of admiralty, under the facts and circumstances of this case, should consider a state statute as applicable to so much of the work as happened to be executed there. In the case of *The H. C. Yaeger*, 1 FED. REP. 285, on analogous principle it was held that services rendered a stranded boat should not be considered as rendered in her "home port," although she was within the territorial limits of her home state, she having commenced her voyage to a "foreign port."

Necessarily, until congress relieves us by legislation, the courts, in dealing with this subject of supply liens under the maritime law and state statutes, must not press the rules made to govern in commerce between actually foreign countries, separated by oceans, gulfs, and straits, or contiguous thereto, to the ridiculous and absurd consequences that would constantly present themselves in the application of those rules to our states and their commercial intercourse along these inland rivers. If a steam-boat lying at Memphis, in Tennessee, and belonging here, be undergoing repairs, and necessity requires that she be moored at Hopefield, a bare landing in Arkansas, across the river, and they be there continued, it would seem an unreasonable application of the distinctions between "home" and "foreign" ports to separate the work before and after such mooring, to give a lien under the general law or any state statute, and better to consider the furnishing as done at Memphis. In the case of *The Ratler*, Taney's Dec. 456, there was a separation of a contract for repairs or supplies, where there was a change of ownership pending the execution of the work, but there a different principle was of obvious application.

The claims, then, for the remodeling cannot be allowed as a lien on any theory of the general maritime law, inasmuch as they were done in Kentucky, where the corporation which owned the boat resided. It matters not that the furnishers resided in Ohio or New York, if they did, for it is not their place of residence that controls the question, but the residence of the owner. 2 Pars. Ship. 326; *The Eliza Jane,* 1 Spr. 152, 156. The claim of Farrer & Tufts, of Buffalo, New York, deserves special attention in this connection; it is for the price of wheels which reached the boat at Cairo. But the proof shows conclusively they were bargained for by Collins himself,

either as owner or as agent for the corporation, and on its credit and not on that of the vessel. It is not different from the other Kentucky contracts finished at Cairo; but, if it were, the wheels were not furnished on the credit of a necessitous vessel in a foreign port, but on the credit of the owner. The case of *The Isaac Davis, supra,* is a direct authority that where the *owner* makes a contract, in the absence of proof to the contrary, the presumption is, even in a foreign port, that the credit was given to him and not to the vessel, and so are all the authorities. Desty, Adm. § 78; *The St. Joseph,* 1 Brown, Adm. 202, 207.

The next question is whether the local law of Kentucky gives a lien. By the Revised Statutes of that state of 1852 it appears there was and had been prior thereto a statute giving a lien in a case like this. Ky. Rev. St. *c.* 7, p. 201, (Stanton.) In the case of *The Aurora* (not reported) I held, while sitting by designation in the district of Kentucky, after full argument, that this statute was repealed by the operation of the new Code of 1873, known as the General Statutes of Kentucky. This latter Code enacts "that all statutes of a general nature in force when the General Statutes take effect, and which are repugnant thereto, are hereby repealed, except as follows, viz." Art. 1, § 2, p. 137. The exceptions are immaterial except that they do not include this boat-lien law, and show a general purpose to have this new Code a complete body of general laws. These General Statutes contain some legislation of a criminal nature on the subject of offences connected with "boats," but do not otherwise legislate about them; chapter 7 of the Revised Statutes, relating to "boats and navigation," being wholly left out. The reason of this omission seems apparent when we consider the history of our admiralty law in its relation to local liens of this character, and instances may be found in the Codes of other states. Under the decisions of the supreme court at the date of the General Statutes these laws were regarded as obsolete. Indeed, most of them were and are yet, so far as they undertake to furnish remedies trenching on the admiralty jurisdiction of the federal courts. But, so far as they were valid as mere declarations of a lien enforceable in the admiralty, until the case of *The Lottawanna,* 21 Wall. 558, and our new twelfth admiralty rule, (13 Wall. 14,) they were quite useless statutes. At the time these General Statutes were collated, these boat-lien laws were thought to be wholly unconstitutional, and I had no doubt whatever the General Statutes omitted this chapter 7 of the Revised Statutes for that reason, and intended to repeal it.

Since *The Lottawanna Case* and the new twelfth rule, the anxiety to hold on to these statute liens is natural, and there is now in Kentucky a law giving them. Act of May 5, 1880.

The language of this repealing clause of the General Statutes is peculiar, but when its general purpose is considered, and we remember the fact that this is a codification of former laws, one of the objects being to start anew and lop off all obsolete and repealed statutes, the construction of such a clause cannot be difficult. I thought the ruling I made found support in *Broaddus* v. *Broaddus*, 10 Bush, 299, and *Sellers* v. *Com.* 13 Bush, 331, and the act of March 17, 1876, *c.* 795, p. 79, which reads as follows:

"That no statute of a general nature enacted *since* the adoption of the Revised Statutes, on the subject-matter of which the General Statutes make provision, shall be deemed to be repealed by the act entitled 'An act to adopt the General Statutes.'"

The inference here is clear that acts *before* the Revised Statutes or continued *in* them were repealed by the General Statutes, if omitted entirely from the latter. I should have no doubt of the correctness of the ruling then made but for the fact that, on consultation by correspondence since this case was submitted with the learned judge of the Kentucky district, he informs me that there is some understanding among the lawyers that the late District Judge Ballard thought the other way, and he himself inclines to a different opinion, though he has not considered the question, and does not wish to be understood as having a definite opinion on the subject. If I had any judicial decision of either of these learned judges on a matter of their local law I should readily conform my judgment to it, but in the absence of this I feel constrained to adhere to my own convictions and the ruling made in *The Aurora*.

The claims for supplies prior to the transfer of the vessel to the Kentucky corporation will be first considered with reference to the general maritime law. The fact that the vessel was enrolled and registered in Cincinnati may make that her "home port" in one sense, and this registration may be sometimes important as a matter of evidence in determining questions relating to supply liens, and possibly controlling in other respects; as, for example, in determining the national character of a vessel; but it is by no means conclusive. Desty, Adm. § 73; 21 Am. Law Reg. (N. S.) 148; *The E. A. Barnard*, 2 FED. REP. 712; *The Tug Coal Bluff No. 2*, 3 FED. REP. 531; *The Secret*, Id. 665; *The Mary Chilton*, 4 FED. REP. 847. The statutes require a vessel to be registered at the port at or nearest to

which the owner, if there be but one, or, if more than one, the husband or acting and managing owner of such vessel, usually resides; and where it belongs to a corporation, in the name of the president or secretary thereof; and on every change of ownership there should be a new registry according to this rule.  Rev. St. §§ 4137, 4141, 4159. But it may frequently occur that the port nearest the residence of an owner is in another state; or the changes may not be actually made, and the vessel be registered in another port than the proper one. Hence this fact of enrollment can only be a circumstance in determining the residence of the owner or owners to be controlled by the actual facts.  *Morgan* v. *Parham*, 16 Wall. 471.  If a furnisher be deceived or misled by it, another principle may be involved; but that need not now be considered.  *St. Jago de Cuba*, 9 Wheat. 409.  Here there were two owners, one living in Kentucky, and doing business in Ohio, across the river, while the other lived in Ohio.  The proof is, there was no husband or managing owner, the vessel being managed by "consultation" between them, and the enrolment might have been in either state, if both Cincinnati and Covington were ports.  But these supply liens in no sense depend on the place of enrolment.  It is only an incident that it is required to be at the place of residence of the owner or managing owner, and of course, in the absence of other proof to the contrary, the presumption would be that the place of enrolment was in the state where the owner resided, but even that is a weak presumption, considering that our states are so contiguous to each other that the nearest port may often be in another state than the residence.  *The St. Lawrence*, 3 Ware, 211; *The Golden Gate*, 1 Newb. 308; *The Superior*, Id. 176; *The Fort Wayne*, 1 Bond, 476; *The Albany*, 4 Dill. 439; *The Loper*, 1 Taney, 500.  The words "home port" are, therefore, misleading in this connection.  The lien depends on the residence of the owner or owners, and while, strictly speaking, a vessel cannot perhaps have two home ports, it may have two or more owners residing in different states, and, in the sense we are now considering, it may be a domestic vessel in each and all of the states where any owner resides.  The real question is whether the supplies have been furnished in a "foreign port," (that is, in a place where there is no owner to supply her on his own credit,) on the credit of the vessel.  Even there, if the owner be present and have sufficient credit, no lien arises.  His mere presence would not, perhaps, avoid the lien; but if he buy the supplies, and be of credit, and have the opportunity to give his own security by making contract liens or otherwise, there is no *implied* lien.  The maritime lien would arise

or not according to circumstances. But in a place where he resides —and this means the state of his residence—the lien does not arise under any circumstances, unless given by the local law. Now it seems to me that this must apply to part owners as well as sole owners. There is no reason for confining it to one part owner more than another. The reason for refusing the lien applies alike to each, namely, a presumption of credit sufficient to answer the demand for supplies, which, in the owner's place of residence, is a conclusive presumption, however the fact may be. The court of admiralty in England, whence we have derived the peculiarities of our law on this subject, has jurisdiction of "claims for necessaries supplied in the possession in which the court is established to any ship of which no owner *or part owner* is domiciled within the possession at the time of the necessaries being supplied;" or, as it is expressed by 24 Vict. c. 10, § 5, "over any claim for necessaries supplied to any ship elsewhere than in the port to which she belongs, unless it is shown to the satisfaction of the court that at the time of the institution of the cause any owner *or part* owner of the ship is domiciled in England or Wales." Coates, Adm. (2d Ed.) 10; 8 Jac. Fish. Dig. 12, 306–7; *The Two Ellens,* L. R. 3 Adm. 345; Abb. Ship. (7th Am. Ed.) 132–166; 2 Bro. Adm. 75–81; Pritch. Adm. Dig. 225; Rob. Adm. 207–223; Dix. Ship. 62; 2 Pars. Ship. (Ed. 1869) 141–155, and 174–190; Desty, Adm. §§ 68–91; 21 Am. Law Reg. (N. S.) 1, 81, 145; 16 Am. Law Reg. 193; *The Sam. Kirkman,* 1 Bond, 369; *The Walkyrien,* 3 Ben. 394; S. C. 11 Blatchf. 241; *The Plymouth Rock,* 13 Blatchf. 505; *The Alice Tainter,* 14 Blatchf. 41; *The Guisborough,* 8 Ben. 407.

I have no hesitation in holding that each and every state in which a part owner resides is *quoad hoc* a "home port," to use the common parlance of the texts on this subject; though it is more accurate to say 'that no lien arises for material-men in any *state* where an owner or part owner resides, than to say that no lien arises in favor of material-men at the *home port.* I find no principle to warrant the argument that the denial of the lien must be restricted to that state or "port" where the vessel is enrolled, or where her managing owner resides. I would gladly see the ancient law of the sea, that gave a lien irrespective of "home" or "foreign" ports, restored; but the power to do this is not with the courts, and the incongruities of our existing laws must be endured till congress acts.

Under the local law of Ohio there was a lien for such of the supplies as were furnished in that state. Ohio Rev. St. § 5880; *The Guiding Star,* 9 FED. REP. 521. Whether that statute would give a

lien to a part owner making advancements for supplies as to other persons is very doubtful. But assuming, as is done in argument, that it does, either by proper construction or by implication from the fact that no distinction is made, give such a lien, yet it does not follow that Collins is to share in this fund with subsequent creditors furnishing the vessel in a foreign port. In the first place, the vessel has since been sold to the Kentucky corporation for value and sent away without enforcing this lien. He is the chief officer and stockholder in the corporation, and the manager of its affairs. The whole scheme was a speculation on his part to utilize his property in this vessel by sending her to build up a trade in strange waters, and whatever would be his rights under this statute or otherwise as between himself and his co-owners, if there were a surplus, as to other creditors he should not have any lien; at least, not where they claim under the general maritime law and not under the local statute. *The St. Joseph,* 1 Brown, Adm. 202, 206; *The Benton,* E. D. Mich. not reported; *The Graf Klot Trautvetter,* 8 FED. REP. 833, 837; *Glover* v. *Ames,* Id. 351; *The Mary Zephyr,* 2 FED. REP. 824; *The Jenny Lind,* L. R. 3 Ad. 529; *The Aneroid,* L. R. 2 P. D. 189.

It is plain from the authorities that, aside from any influence of the statute on the question, a part owner cannot be permitted to share with lien creditors. Collins was in fact only paying his own debts, and making advancements for his own property which he afterwards sold for value to the corporation in Kentucky. But conceding that the statute may give him a lien in a case where, under the maritime law, even in a foreign port, he would have none, the lien in my judgment must be subject, in its relation to other liens, to the general principles of the maritime law. It is the settled doctrine of this circuit that these local liens for supplies are of equal merit with like liens given by the general law; and conceding the power of the state to legislate on the subject to the extent of creating them, this would seem to be the inevitable consequence, and I cannot see that there should be any difference between them. *The General Burnside,* 3 FED. REP. 228. Indeed, it seems to me to be an inexorable necessity that the liens created by statute and all their incidents should be moulded upon and controlled by the maritime law. While they may be properly placed in the same grade of merit as maritime liens of like character, they should not acquire, by force of the statute, exemption from the operation of the rules of decision that control maritime liens in their relation to each other because this would be to give the states power to alter or repeal these rules of the general maritime law. For

example, the Kentucky statute of 1852 gives the local lien preference over all other liens of like character for work done out of the state, thus preferring them to maritime liens for supplies. It might be conceded, perhaps, that such a statute would be inoperative in that regard, but it is difficult to say why the state, having power to legislate at all, should not be unrestricted, and possess full power over the maritime law in that state. The solution of the difficulty would seem to lie in interpreting the legislation as designed in conformity to the maritime law. I see no reason why an admiralty court should not, at least in another state than that giving the local liens, conform them to the principles of the maritime law in this matter of priority, notwithstanding the statute, very much as a court of equity will sometimes modify strict legal rights under a statute or a contract according to equitable principles, and that, too, with due regard to the necessity for strict obedience by the courts to constituted legislative authority. But it is not a violent presumption that a state legislature, in the creation of liens to be exclusively enforced by tribunals of another jurisdiction, intends that the legislation shall be adapted to and interpreted by the principles that govern the peculiar jurisprudence of the jurisdiction that enforces it. Therefore it seems to me a fair implication, whenever a state attaches a lien to a maritime contract to be enforced in the admiralty, that whatever would operate under the maritime law of that court to waive, forfeit, or postpone a lien of like character, whether considered in its relation to liens of another grade or in its relation to other liens in the same grade, should have the same effect on the lien created by the state, and that it is intended that the strict letter of the statute should be so construed. Desty Adm. §§ 82–89; 21 Am. Law Reg. (N. S.) 147; *A New Brig*, Gilp. 473; *The Hornet*, Crabbe, 426; *The Indiana*, Crabbe, 479; *The T. P. Leathers*, 1 Newb. 432; *The Katie*, 3 Woods, 182. This is precisely the principle on which the case of *The General Burnside, supra*, places a local lien for supplies on an equal footing with a maritime lien for supplies; but being so placed it must take its chances with the others and submit to whatever equities for preferment may exist in the facts of the particular case in favor of one over another, and cannot claim any exemption from this application of the principles of maritime law by reason of the letter of the statute.

Collins, therefore, assuming that the local law gives him a lien for advances made by him at Cincinnati, and that it must be placed in the same grade with other supply liens, would, on the plainest prin-

ciples, be postponed to merchants furnishing the vessel in the new employment in which the corporation managed by him placed her, because he was part owner, and personally liable for supplies furnished before the sale of the vessel, and because while the lien in his favor existed he sold the vessel for value to a corporation of which he is the chief stockholder and principal officer, on a speculation that she could be profitably employed in a distant trade. He cannot claim any greater fixity of lien, or any exemption from this postponement, by reason of the statute. It is in my judgment a misapprehension of the whole subject to suppose that state statutes can have any such effect, or that the doctrine of the case of *The General Burnside, supra,* can be invoked in favor of such a treatment of the local lien. Equality in all respects should be the rule.

I understand the district courts of Ohio treat this local lien on the same principle. *The Guiding Star, supra.* It was there contended that the state statute made no distinction between liens given for maritime and non-maritime contracts, and that the admiralty court should make none; but the argument did not prevail. It is true, the court had no jurisdiction to enforce liens by proceeding *in rem* for breach of *non-maritime* contracts, and that was the ground of the decision; but the principle goes further. Having jurisdiction to enforce the maritime contracts and the lien given by state statute, a non-maritime creditor, with a lien by the same statute, might intervene against the proceeds. 16 Am. Law Reg. 195, and cases cited. If the statute makes no distinction between them, the only ground on which a court of admiralty may, is that it regards them, in accordance with the doctrines of the maritime law, in the order of their *merit*, notwithstanding the statute. I am not prepared to say here that where the lien for the maritime and non-maritime contract is exclusively created by the state statute, the court, in distributing the proceeds acquired by jurisdiction to sell the vessel under the maritime contract, should not obey the statute, other things being equal; but I have no doubt whatever that, in the absence of any express command of the statute, and perhaps in the teeth of it, in a conflict between maritime claims under the general law and the statute, or between the local liens themselves, the court will apply its own peculiar doctrines in determining the relative merit of the claims, and whether they have been waived, forfeited, or lost, or whether they should be postponed to each other, and all this regardless of the source of the lien, which, in my judgment, is wholly immaterial. In other words, the court

will grade the liens according to maritime merit, from whichever source derived, and those in the same class will be paid according to the facts of the case in the order of respective merit. Beyond the domain of the general maritime law, and where it furnishes no rule, and within that of the local law where it furnishes a rule, the statute may be looked to; but it cannot control to make equal that which the general law prefers.

The next question concerns the local liens under the statute of Ohio in favor of other claimants than Collins, who insist that they should share *pro rata* with the creditors furnishing the vessel at Memphis. But I think they are governed by the same principles already discussed in respect to the Collins claim; and I do not find it necessary to determine whether they have been waived, forfeited, or lost by the negligence of the claimants, as urged in argument, because, however this may be, they should be postponed to the later claims on the special facts of this case. First in point of time is not always first in point of right, though it sometimes is in an admiralty court; nor is the peculiar rule that liens for supplies shall be paid inversely in the order of time an inflexible one. Each case depends on its own circumstances, and generally the distribution is made without exact regard to time, the rule of equality being generally, but not always, uppermost in favor. These local lienholders had at their own homes two owners of ample means, or at least one, who now seeks to share in this fund as a creditor for advances, on whom they could have relied for payment. They saw this vessel sold to a corporation in a state across the river of which these same owners were the principal part; they saw her carried to that state for reconstruction or repairs; they saw her depart thence for distant waters, on a purely speculative venture of building up a trade in those distant waters, and took no steps to arrest her and enforce their liens. She was furnished no money, and was expected, as the proof shows, to earn it here, where the other claimants furnished her in distress, and on her credit, away from the residence of her owners. On these facts, these latter, even in the same grade, should be preferred.

This was one of the most ancient of the good customs of the sea:

"Further, the merchant is bound to the managing owner of the ship in such manner that if the merchant has money, and they are in a place where the managing owner of the ship has need of ship's apparel or things which are necessary for the ship, the merchant ought to lend it to him according to what the mate and the other merchants adjudge to be done, and for such

reason all the part owners who shall be in the ship, *and any earlier lenders*, ought to be bound to the said merchants." 3 Twiss, Black Book of the Admiralty, c. 61, p. 163; 2 Pars. Ship. 151, and note; Desty Adm. §§ 82–89; 21 Am. Law Reg. (N. S.) 149, citing 49 London L. Mag. 146; *The City of Tawas*, 3 FED. REP. 170; *The Delos De Wolf*, Id. 236, 239; *The Paragon*, 1 Ware, 321, 322; *The Jerusalem*, 2 Gall. 345; *The Brig Magoun*, 1 Olc. Adm. 55, 66; *The Brig Omer*, 2 Hughes, 96; *The Grapeshot*, 2 Ben. 527; *The Heinrich*, L. R. 3 Ad. 505; *The Key City*, 14 Wall. 658; *The Lauretta*, 9 FED. REP. 622; *The Harrison*, 2 Abb. 74, and note; *The Boston*, 1 Blatchf. & Howl. 309; *The Utility*, Id. 218; *The General Jackson*, 1 Spr. 554; *The Theodore Perry*, 8 Cent. Law J. 191.

I do not wish to be understood as holding that the latest furnisher is always to be paid first, but only that on the facts of the case the court may, where superior merit arises, either out of benefits conferred in preserving the vessel in her last distress, or for supplies so furnished, or because of the negligence of the older claimants in failing to promptly enforce their liens, prefer the one whose money was latest advanced to relieve the vessel and save her to those interested, whether owners or prior lienholders. There is in courts of admiralty as well as courts of equity the power to prefer one creditor to another in the same class where the case demands it, although equality is the general rule in both courts. In suits for wages of mariners the one who first arrests the vessel will sometimes be preferred, and bottomry bondholders are, in cases of distress of the vessel, preferred in the inverse order of their advances. Desty, Adm. §§ 111, 175.

Collins claims to be the *assignee* of some of these local liens, but manifestly he can be in no better position than the original holders. There is no proof of any assignment. He paid the claims, but he was only paying his own debts. Pure maritime liens are not assignable; at least, that seems to be the weight of authority. Coote, Adm. (2d Ed.) 19; Desty, Adm. § 86; *The Champion*, 1 Brown, Adm. 520. Whether these local liens are assignable need not now be decided. In addition to the authorities already cited the following cases will be found instructive on the general subjects here discussed. *The Canada*, 7 FED. REP. 119, 730; *The Wexford*, Id. 674; *The Erinagh*, Id. 231; *The Short Cut*, 6 FED. REP. 630; *The Trenton*, 4 FED. REP. 657, 666; *The Bob Connell*, 1 FED. REP. 218; *The Buckeye State*, 1 Newb. 111; *The Detroit*, 1 Brown, Adm. 141; *The Hercules*, Id. 560; *The Dubuque*, 2 Abb. 20; *The Harriet Ann*, 6 Biss. 13.

I wish, before closing, also to express my obligation to the kindness of the learned judge of the eastern district of Michigan, eminent for

his knowledge of these subjects. I have not the opportunity to submit these views to his scrutiny, and do not at all know that he would approve some of them, but have had the benefit of his learning as to others.

The claims will be allowed or disallowed according to the instructions herein, and it is so ordered.